UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARREN HANDY, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>LOGMEIN, INC.,<br><br>          Defendant. | Case No.: 1:14-cv-01355 - JLT<br><br>ORDER GRANTING DEFENDANT'S CONVERTED MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 63) |

In his third amended complaint, Darrin Handy claims that Defendant offered two products that allowed users to access a remote desktop computer via a virtual private network.  The first product, LogMeIn Free, was a free product that allowed the user to access the remote desktop computer from another laptop or desktop computer.  The second product, Ignition, allowed access using a tablet or smart phone and sold for $29.99.  In 2014, Defendant notified users of LogMeIn Free that it would no longer offer this free product and that it was planning to migrate all users of that product and the users of Ignition to a paid subscription service, which offered a few extra amenities.

In this action, Plaintiff complains that he did not know that Defendant could discontinue the free product and that had he known he would not have purchased Ignition.  He claims also that Defendant improperly notified users that it would discontinue Ignition to mislead users into purchasing a subscription to its newer product, LogMeIn Pro.  As a result, he seeks damages on his behalf on behalf of others similarly situated.

Because the Court concludes that Plaintiff cannot demonstrate Defendant made a misrepresentation or a material omission, the Court **GRANTS** judgment[1] in Defendant's favor.[2]

## I.      Factual Allegations

Plaintiff alleges he purchased an application called "Ignition" from iTunes for $29.99 on April 4, 2010.[3]  (Doc. 60 at 3)  Ignition was Defendant's product that allowed users to access a desktop computer remotely through a smart phone or tablet via a VPN.[4]  Id.  A year before this, on February 20, 2009, Plaintiff downloaded Defendant's free product, LogMeIn Free, which allowed users to access a remote desktop from another desktop also via a VPN. (Id. at 4; Doc. 63-1 at 9; Doc. 68-2 at 5)  Most of Defendant's customers used the free product.  Id.  Defendant had offered this free product "for years."  Id.

Sometime before January 21, 2014, Defendant introduced a third product, "LogMeIn Pro." (Doc. 60 at 4)  It provided remote desktop access and additional features such as "remote printing and file sharing," but it required payment of an annual subscription fee. Id.  Most of Defendant's customers did not choose, initially, to subscribe to LogMeIn Pro and did not need the extra services provided by the "pro" version.  Id.  Most "average consumers" continued to use only LogMeIn Free or both

---

[1] Though the Court has discretion to grant leave to amend the complaint even if it grants summary judgment, at the hearing, Plaintiff's counsel stated that Plaintiff was not asking for further leave.

[2] Plaintiff argues against the Court converting the motion to one brought under Rule 56.  This objection is **DENIED**.  In addition, the Court **DENIES** the request for discovery.  Notably, none of the topics upon which Plaintiff seeks discovery (Doc. 68-1 at 9) bear on the question of liability.  At the hearing, Plaintiff's counsel noted that the key discovery he sought was related to consumer complaints made to Defendant and argued that this information was within Defendant's exclusive control.  However, counsel admitted also that he had access to "10,000 pages" of complaints lodged on Defendant's website and with iTunes and Google apps.  Thus, it is apparent that if there was evidence that bears on the issues before the Court, Plaintiff *did* have access to it but chose not to rely on it.

[3] Plaintiff seeks to certify a class that includes all California users of Ignition who purchased the app before January 21, 2014.  (Doc. 60 at 21)

[4] Though Plaintiff characterizes Ignition as "an extension/add-on feature" LogMeIn Free, he offers no facts to support this conclusion.  Id.  This is not the first time the Court has reminded Plaintiff of the difference between facts and conclusions.  If, indeed, Ignition was a mere supplementation to LogMeIn Free, he was obligated to allege facts that this was the case rather than offering his mere conclusion that it was.  Notably, the way he describes each product in this complaint, as in the prior complaint, makes clear that Plaintiff's belief was unfounded.  The fact that Plaintiff wanted to have access to a remote desktop from both a desktop or tablet/smart phone, does not mean that either product is integral to the other.  Moreover, even if many others wanted both of these options, once again, this does not mean that each was not a standalone product.  The Court has been very clear on this point and concludes that because Plaintiff continues to fail to allege facts that the products were "companions," he is unable to do so.
    This is not the only conclusion stated in Plaintiff's complaint which is unsupported by factual allegations.  Because there are so many, the Court simply rejects and ignores the conclusions as irrelevant to the discussion here.

LogMeIn Free and Ignition. Id.

On January 21, 2014, "Defendant posted [a] message on its website, stating '[s]tarting in January, we will gradually migrate users of LogMeIn-branded remote access offerings and Ignition-branded remote access offerings to a single, premium access product.'" (Doc. 60 at 5)  Also, when LogMeIn Free users attempted to login in, on January 21, 2014, they received a message that read, "**You no longer have access to your computers.** In order to continue using remote access, you'll need to purchase an account subscription of LogMeIn Pro. But you can still take advantage of discounted introductory pricing, with packages starting at $49/year for two computers." Id.

Defendant explained further on its website that,

> LogMeIn Free will no longer be available starting January 21, 2014. We will begin gradually migrating users of LogMeIn and Ignition-branded remote access offerings to a paid-only account-level subscription of LogMeIn Pro.
> …
> For owners of LogMeIn Ignition for iPad/iPhone and LogMeIn Ignition for Android.
>
> While customers who purchased these apps are impacted by this change, we have taken steps to be especially attentive to these customers. LogMeIn Ignition for iPad/iPhone and Android app purchasers will receive significant discounts, as well as generous terms to ease the transition. Details of these offers are being sent to Ignition mobile users this week, both via email and in-product notifications."

(Doc. 60 at 6)  Defendant also explained on its website, "to address the evolving needs of our customers, we will be unifying our portfolio of free and premium remote access products into a paid-only offering." Id. at 6.  Defendant offered anyone who had used LogMeIn Free a six-month free subscription to LogMeIn Pro.  (Doc. 17-3 at 2-3, 6-9)  After this, users could choose to buy a further subscription or the service would be terminated. Id.  Nevertheless, Plaintiff concluded that, "LogMeIn was entirely discontinuing all technical and financial support, including the server functionality and databases, required to maintain a continued level of service for both Ignition and LogMeIn Free users.[5]"  (Doc. 60 at 7)

Consistent with its statement that it would provide additional details to Ignition customers, on January 31, 2014, Defendant clarified that Ignition users too could take advantage of the six-month free subscription to LogMeIn Pro.  (Doc. 17-3 at 3)  However, Defendant explained that they could continue

---

[5] However, Plaintiff does not allege *why* he came to this conclusion.  He does not allege that Defendant made any statements in January 2014 related to technical or financial support for Ignition.

3

to use Ignition regardless of whether they chose to accept the six-month subscription.  Id.  Defendant also explained that regardless of whether they accepted the complementary subscription or regardless of whether they purchased a subscription after the end of the six-month free trial, they could continue to use Ignition for as long as Defendant maintained the app.  Id.  Defendant reminded Ignition users of these options again on February 14, 2014.  Id.

Sometime after the January 21, 2014 communication, Plaintiff alleges he attempted to log into his LogMeIn Free account and received this message:

> **"You no longer have access to your computers.**
>
> In order to continue using remote access, you'll need to purchase an account subscription of LogMeIn Pro. But you can still take advantage of discounted introductory pricing, with packages starting at $49/year for two computers (bold face in original)."

(Doc. 60 at 10)  Due to this message, Plaintiff concluded he could no longer access *either* his LogMeIn Free or Ignition accounts.[6]  Plaintiff alleges that, "Thereafter, Plaintiff temporarily ceased all use of the LogMeIn Ignition and LogMeIn Free services entirely."[7]  Id. at 11.  As a result, Plaintiff "incurred additional expenses, including travel expenses, cost of fuel, and additional commuting time to and from his physical office, and also lost value stemming from his discontinuation of use of a product he had already paid $29.99 for."  Id.

Plaintiff concludes that due to the messages issued by Defendant, Ignition customers stopped using the app which decreased Defendant's costs "due to reduced costs in tech-support, customer service, and infrastructure and bandwidth costs, [and received] increased revenues from sales of LogMeIn Pro accounts, subscribed to by consumers who would not have otherwise subscribed, but for Defendant's misleading statements, and forced migration of users to the paid subscription model."  (Doc. 60 at 11)  Plaintiff alleges that Defendant later clarified that Ignition would continue to function

---

[6] Again, he fails to allege facts to explain his conclusion that merely because he was told he no longer had access to his LogMeIn Free account that he likewise had no access to his Ignition app.

[7] Notably, however, he logged into his Ignition account twice the next day and resumed nearly daily use on February 20, 2014 and has continued to use it regularly since that time.  (Doc. 63 at 21-35)  Though Plaintiff alleges he did not use Ignition "for a full month," (Doc. 60 at 11), this is not quite true.  Moreover, Plaintiff offers no explanation for the fact that if he believed Ignition "had ceased working entirely due to Defendant's statements that the App would no longer be supported, and also being of the mind that, even if it did work, that it was of limited value without the functionality of the base/companion LogMeIn Free service to which it was an actual and intended add-on service" (Id.), why or how he was able to continue to use Ignition without interruption through 2015.

but that consumers remained confused and lost "use and enjoyment over their purchase of Ignition Apps." Id. at 12.  Plaintiff does not describe in what manner users lost enjoyment.

Plaintiff contends the statements noted above were made to "deceive[ ] Plaintiff and others into believing that the product they paid for was no longer serviceable and available for use, as part of a widespread and systemic ruse to unfairly, fraudulently and unlawfully induce said consumers into purchasing paid subscription services rather than continue using the already purchased, free and clear, Ignition app services, at considerable and previously undisclosed additional expense." (Doc, 60 at 12-13)  In addition, Plaintiff complains that by being required to pay an annual subscription for the use of Ignition despite that he had already paid $29.99 for the app was "classic bait and switch."  Id. at 14. Plaintiff complains that he was misled because Defendant did not tell him when he purchased Ignition that he could be required in the future to pay additional amounts for the "exact same service."[8]  Id. at 13, 14.

Likewise, he alleges that because Ignition users "relied on the free use of LogMeIn Free" and that they were "inextricably intertwined" because of technology, user preferences and consumer expectations.  (Doc. 60 at 14)  He alleges, "LogMeIn Free and LogMeIn Ignition both served a similar role, and are utilized for this same function, yet in separate contexts and temporal settings. In this sense, LogMeIn Free and Ignition are complementary products and services, which were intended, developed and marketed by Defendant to be used in tandem (depending on the setting), not in isolation." Id.  He alleges also that customers desired to use Ignition only as a complement to LogMeIn Free.[9]  Id. at 15.

In this motion, Defendant argues Plaintiff has failed to meet the heightened pleading standard for fraud and has failed to identify any misrepresentation that induced his purchase of Ignition. Likewise, Defendant argues Plaintiff has failed to meet the heightened pleading standard related to any

---

[8] Notably, Plaintiff does not mean the "exact same service" as when he purchased it in 2010.  Rather, he seeks use of the app *along with* updates provided by Defendant at no additional charge.  He offers no evidence or, even, any allegations that Defendant assured him that in addition to buying the app, he was buying updates.

[9] This allegation stands in stark contrast to his earlier one in which he claims that Defendant marketed Ignition as a "one-and-done product" and "One app to control all your information." (Doc. 60 at 4, 18)  The claims that a product is "one-and-done" and is "one app to control all your information" but then interpret this to mean that the product is intended as a "tag-along" to another product, is illogical.  The claim that the products are "inextricably intertwined" is belied further by the facts that Plaintiff used LogMeIn Free for about 14 months before buying Ignition and that he continued to use Ignition without LogMeIn Free for at least 19 months after LogMeIn Free was terminated.

omission, has failed to identify what statements Defendant *did* make to him which should have included the omitted information when buying Ignition and has failed to allege a duty Defendant owed not to make the omission.

In support of its motion, Defendant submitted evidence demonstrating that Plaintiff obtained LogMeIn Free on February 20, 2009. (Doc. 63-1 at 2) At that time, those wishing to download the app from iTunes were directed to LogMeIn's webpage and were required to demonstrate they accepted the terms and conditions of the use of the app by affirmatively clicking a button. Id. There was no way to obtain the app absent this affirmative acceptance of the terms and conditions. Id.

The terms and conditions indicated,

> **LMI may in its sole discretion immediately terminate** these Terms and this subscription, license and **right to use any Product if** (i) You or the Contracting Party breach these Terms; (ii) LMI is unable to verify or authenticate any information You provide to LMI; (iii) such information is or becomes inaccurate; or (iv) **LMI decides, in its sole discretion, to discontinue offering the Product. LMI shall not be liable to You, the Contracting Party or any third party for termination of the Service or use of the Products.** Upon expiration or termination for any reason, You and the Contracting Party are no longer authorized to use the Products. When these Terms are terminated and/or the subscription is canceled, You and the Contracting Party will no longer have access to data and other material You or the Contracting Party have stored in connection with any Service and that material may be deleted by LMI. All disclaimers, limitations of warranties and damages, and confidential commitments set forth in these Terms or otherwise existing at law survive any termination, expiration or rescission of these Terms.

(Doc. 63-1 at 16, emphasis added) The terms and conditions applied to both LogMeIn Free and Ignition. Id. at 11 ["These terms and conditions . . . govern the use and licensing by LMI of the following LogMeIn® service(s) and related software: . . . LogMeIn® Free® . . . Ignition$^{TM}$, . . ."] The terms and conditions reserved in Defendant, "the right to modify or discontinue any Product for any reason or no reason with or without notice to You or the Contracting Party." Id. at 12. The terms and conditions note,

> You understand that LMI may update the Products at any time, but is under no obligation to inform You or the Contracting Party of or furnish to You or the Contracting Party any such updates. These Terms do not grant You or the Contracting Party any right, license or interest in or to any support, maintenance, improvements, modifications, enhancements or updates to the Products or supporting documentation. To the extent that LMI supplies any updates to You or the Contracting Party, such updates will be deemed to be subject to the terms of these Terms unless LMI indicates otherwise. LMI reserves the right to charge fees for any future versions of, or updates to, the Products.

Id. at 16. Finally, the terms and conditions note, "These Terms represents the complete agreement concerning the subject matter of the Terms and license granted hereunder and, except as set forth herein, may be amended only by a writing executed by both parties. You and the Contracting Party understand and agree that You and the Contracting Party are solely responsible for periodically reviewing these Terms." Id. at 17. In addition, Defendant provided evidence detailing that from January 2014 through August 2015, Plaintiff used Ignition regularly and, in total, logged in approximately 800 times during this period. (Doc. 63-1 at 21-35)

After being alerted the Court intended to convert the motion to one brought under Rule 56, and being afforded the opportunity to provide countering evidence, Plaintiff filed a declaration. (Doc. 68-2) Though not disputing that he downloaded LogMeIn Free on February 20, 2009, Plaintiff declares, "I do not have a specific recollection of the date that I signed up for LogMeIn Free. I do recall that I never visited any website containing Terms and Conditions when I did sign up for LogMeIn Free." (Doc. 68-2 at 5) He then asserts, "I have never seen the Terms and Conditions of Use attached to the Declaration of Tara Haas, prior to LogMeIn's submission of this document into evidence."[10] Id.

Plaintiff also declares, "In purchasing the LogMeIn Ignition application, **I do not recall** being prompted to visit the LogMeIn website, **nor do I recall** being asked to review LogMeIn's Terms and Conditions of Use, prior or subsequent to my purchase." (Doc. 68-2 at 3, emphasis added) Then, contrary to his express declaration that he lacks a recollection on the topics, he states, "**It is my firm recollection that** I was asked to do neither of these things [visiting Defendant's website or reviewing the terms and conditions] in purchasing the Ignition App from the iTunes store. I never noticed any link to LogMeIn's Terms and Conditions of Use. I was not required to, nor did I, click any link to the Terms and Conditions of Use. I did not see or read LogMeIn's Terms and Conditions of Use prior to attempting or during my purchase of the Ignition application." Id. at 4, emphasis added. Despite these statements, at the hearing Plaintiff's counsel stated that Plaintiff does not contest the authenticity of the Terms and Conditions presented, that these Terms and Conditions were in place and available on the website at the relevant times and that there was a click-wrap agreement.

---

[10] Impliedly, he means that even if the terms and conditions were available for his review, he did not review them.

7

In addition, despite his express statements in the past that he permanently discontinued using Ignition in August 2014[11], now he states, "I stopped using the Ignition App for about a month."[12] (Doc. 68-2 at 7)  Though he doesn't state explicitly when this occurred, the context of his earlier statements implies that he now claims he stopped for a short period in January 2014 and the information provided by Defendant makes clear that this did not happen in August 2014.  In addition, despite his prior pleading that he received one alert when he logged into LogMeIn Free which stated, "you no longer have access to your computer," now he states he *also* received a similar message during the week of January 20, 2014, when he logged into Ignition.[13] Id. at 6.  Finally, he states, "I have since learned that the Ignition App is still functional . . ."[14] Id. at 7.  Notably, however, Plaintiff does not allege this in the complaint.

For the reasons set forth below, the Court finds that Defendant provided notice that LogMeIn Free and Ignition could be terminated and that the statement that Ignition customers would be

---

[11] The Court is troubled by Plaintiff's changing story in this regard.  In his previous complaints, he alleged that he stopped using Ignition permanently in August 2014 because he believed Defendant's actions made it obsolete. (Doc. 46 at 10-11 ["As of August 19, 2014, Plaintiff reasonably believed that he could no longer utilize Defendant's app without paying the undisclosed fee now required by Defendant."]; Doc. 19 at 7-8 [same]; Doc. 1 at 5 [same]; Doc. 46 at 11 [same]; Doc. 26-2 at 2 ["Prior to filing this Action [on August 24, 2014], I spoke extensively with Plaintiff.  During said discussions, Plaintiff informed that Plaintiff was no longer to use Defendant's App despite paying $29.99 for said App."]  Now, when confronted with evidence he continued to use the app after January 2014, and that he has continued to use it throughout 2015, Plaintiff ignores these prior assertions, doesn't explain them and instead claims, "I stopped using the Ignition App for about a month [in January 2014]." (Doc. 68-2 at 7.) All of the complaints filed in this Court were based upon "Plaintiff's . . . personal knowledge." (Doc. 1 at 2; Doc. 19 at 2; Doc. 46 at 2; Doc. 60 at 2.)  Though the Court could understand that Plaintiff had imperfect recall about a short period of time when he did not use the app, the Court has no understanding how Plaintiff was mistaken when he said he stopped using he app entirely in August 2014 but now says he only stopped for a few weeks in January.  His prior statements smack of falsity.

Likewise, it appears that he involved his attorneys in these falsities.  For example, in opposition to the motion for Rule 11 sanctions, attorney, Mr. Loker, reported, "Based upon my review of this information [posted on Defendant's website], in conjunction with the forums of consumers complaining about Defendant's App, I reasonably believe, and continue to believe, that consumers were required to pay additional funds in order to continue using Defendant's App and accompanying services to their full capacity."  (Doc. 26-2 at 3) Notably on the very day that Mr. Loker signed his declaration, Plaintiff logged into the app at least a couple of times.  (Doc. 63 at 25)

[12] Before his login on January 22, 2014, he had logged in only once in the preceding three weeks, on January 3, 2014.  (Doc. 63-1 at 35)

[13] However, this claim is not pleaded in the third amended complaint and he does not claim that this statement forms a basis for his causes of action.  Moreover, when confronted with the inconsistencies at the hearing, Plaintiff's counsel admitted that Plaintiff is not certain whether he received the messages or when and claimed that Plaintiff did not intend—despite the explicit language of the declaration—to convey the idea that Defendant gave this message in January 2014.

[14] Once again, because he didn't use the app for a short period but then continued to use it throughout the entirety of 2014 and throughout 2015, it appears that this statement, "I have since learned that the Ignition App is still functional," is, if not an express falsehood, is implicitly so.

8

"gradually migrated" to a subscription based service was not misleading.

## II. Legal Standards

### A. Motion to Dismiss

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Iqbal, 556 U.S. at 678 (internal citations, quotation marks omitted). Further, factual allegations of a complaint must be accepted as true when the Court considers a motion to dismiss. Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976).

In considering a Rule 12 motion, generally the Court is limited to considering only the allegations of the pleading. However, where the Court considers evidence presented by a party that is outside the pleading, the Court must treat the motion as one brought under Rule 56. Fed. R. Civ. P. 12(d). Here, in determining the motion, the Court will consider the evidence submitted in support of and in opposition to, the motion. Thus, the Rule 56 standards apply.

### B. Motion for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, Rule 56 allows a court to grant summary adjudication, or partial

summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also* Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); Mora v. Chem-Tronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Wool v. Tandem Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); Matsuhita, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. Id. at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir.

1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. Orr, 285 F.3d at 772; Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

### III.     Plaintiff's Claims

Plaintiff raises two causes of action. In the first, he claims a violation of Business and Professions Code section 17500, et seq. (Doc. 60 at 23) He alleges that,

> Defendant made misleading statements to Plaintiff and other similarly situated consumers, which caused them to reasonably believe that Ignition and LogMeIn Free were both being discontinued, and that in order to receive the same level of service as previously paid for in full, Plaintiff and other similarly situated consumers would need to pay additional subscription fees and sign up for a LogMeIn Pro account. Further, Defendant misled consumers by leading Plaintiff and other Class Members to believe that LogMeIn Free and Ignition were companion services, while failing to disclose that the app would be rendered obsolete and substantially less valuable, useful and practical by Defendant's own business decisions, at a later time, and that considerable subscription fees would be required to continue using the applications.

Id. Plaintiff also claims that Defendant made material omissions. He claims,

> Defendant had a duty to disclose the fact that additional fees may apply to Plaintiff's purchase, but failed to make such disclosures. Defendant also misled consumers by leading them to believe that the product they had purchased, for valuable consideration, was now valueless and functionless, in order for Defendant to monetarily gain advantage over its customers and avoid future foreseeable expenditures for reasonable maintenance costs.

Id. at 24.

Plaintiff's second cause of action arises under California's Business and Professions Code § 17200. (Doc. 60 at 26) In essence, Plaintiff claims that Defendant's decision to require users to obtain a subscription and the misrepresentations and material omissions identified in the first cause of action

11

were "unfair," as that term is define under the Unfair Competition Law. Id. at 26-27. In addition, he claims that Defendant committed "fraud" by charging the fee for Ignition only later to require a yearly subscription to use it. Id. at 28. Finally, Plaintiff claims that Defendant's act in failing to inform prospective Ignition purchasers that its later business decision would render use of Ignition obsolete was "unlawful." Id. at 29.

## IV. Discussion and Analysis

### A. Applicable statutes

#### i. False Advertising Law

California's False Advertising Law prohibits any person or entity from making an untrue and misleading statement in advertising. Cal. Bus. & Prof. Code § 17500. It is unlawful for any company to make any statement concerning products offered, which is known or should be known, to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. A false advertising claim under this section may be brought "where the advertising complained of is not actually false, but thought likely to mislead or deceive, or is in fact false." Day v. AT&T Corp., 63 Cal. App. 4th 325, 332 (1998). Thus, the FAL proscribes "not only those advertisements which have deceived or misled because they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." Id. (emphasis omitted). In addition, a plaintiff may state a claim under the FAL for fraudulent omissions by a defendant. See Ehrlich v. BMW of North Am., 801 F. Supp. 2d 908, 916 (C.D. Cal. 2010).

To state a cognizable claim for a fraudulent omission, a plaintiff must allege the defendant's omission was "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obligated to disclose." Ehrlich, 801 F. Supp. 2d at 916 (quoting Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007)); *see also* Daugherty v. Am. Honda Motor Co., Inc., 144 Cal.App.4th 824, 835 (2006). Under California law,

> There are four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

LiMandri v. Judkins, 52 Cal.App.4th 326, 336 (1997) (quoting Heliotis v. Schuman, 181 Cal.App.3d

646, 651 (1986)). To demonstrate "exclusive knowledge by the defendant," a plaintiff must provide sufficient factual allegations to support his claim that at the making of the contract, the defendant was aware of facts which could not be known by the plaintiff and which, if known, would dissuade the plaintiff from completing the purchase. *See* Donohue v. Apple, Inc., 871 F.Supp.2d 913, 927 (N.D. Cal. 2012).

To demonstrate active concealment by a seller, a plaintiff must allege sufficient factual support for five elements:

> (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007). A fact is deemed material "if a reasonable consumer would deem it important in determining how to act in the transaction at issue." Collins v. eMachines, Inc., 202 Cal.App.4th 249, 256 (2011) (internal quotation marks, citation omitted); *see also* Elias v. Hewlett-Packard Co., 950 F.Supp.2d 1123, 1134-35 (N.D. Cal. 2013) (same).

### ii. Unfair Competition Law

California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. To have standing to state a claim under either statute, a plaintiff must have suffered an injury in fact, which may be shown when he or she "(1) expended money due to the defendant's acts . . .; (2) lost money or property; or (3) been denied money to which he or she has a cognizable claim." Chacanaca v. Quaker Oats Co., 752 F. Supp. 2d 1111, 1125 (N.D. Cal. 2010). To state a cognizable claim, the plaintiff must allege that he relied upon the misrepresentation or material omission and that it was the immediate cause of the economic injury. Id.; Doe v. SuccessfulMatch.com, 70 F. Supp. 3d 1066 *5-6 (N.D. Cal. 2014); Kelly v. BP W. Coast Products LLC, 2014 WL 7409220, at *8 (E.D. Cal. Dec. 30, 2014) ["The term "bait-and-switch" describes a scheme in which the fraudster lures in his victims "with glib salesmanship," never intending to deliver the product advertised, carefully laying and springing his trap."]. Likewise, the plaintiff must

allege facts sufficient to demonstrate the defendant's representations "are likely to deceive a reasonable consumer." Red v. Kraft Foods, Inc., 2012 U.S. Dist. LEXIS 164461 at *6, 2012 WL 5502754 (C.D. Cal. Oct. 25, 2012) (citing Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008)).  Thus, the relevant statements/omissions are evaluated under the "reasonable consumer test." Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)

Actions prohibited by § 17200 include "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." Saunders v. Superior Court, 27 Cal.App.4th 832, 838-39 (1994).  Thus, the "unlawful" prong requires an underlying violation of law. Krantz v. BT Visual Images, 89 Cal.App.4th 164, 178 (2001). An "unfair" practice under section 17200 is one "whose harm to the victim outweighs its benefits." Saunders v. Superior Court, 27 Cal. App. 4th 832, 839 (1994).  A "fraudulent" practice under § 17200 is "one which is likely to deceive the public," and "may be based on misrepresentations … which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." McKell v. Washington Mutual, Inc., 142 Cal.App.4th 1457, 1474, 49 Cal.Rptr.3d 227 (2006).  The Unfair Competition Law and False Advertising are related such that "any violation of the false advertising law . . . necessarily violates the UCL.'" Kasky v. Nike, Inc., 27 Cal. 4th 939, 950 (2002) (quoting Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 210 (1983)).

**B.     Defendant's motion**

As before, Defendant continues to argue that Plaintiff has failed to identify any affirmative misrepresentation made by it when he purchased the Ignition app. (Doc. 63 at 17)  As set forth above, Plaintiff claims the following:

> Defendant made misleading statements to Plaintiff and other similarly situated consumers, which caused them to reasonably believe that Ignition and LogMeIn Free were both being discontinued, and that in order to receive the same level of service as previously paid for in full, Plaintiff and other similarly situated consumers would need to pay additional subscription fees and sign up for a LogMeIn Pro account. Further, Defendant misled consumers by leading Plaintiff and other Class Members to believe that LogMeIn Free and Ignition were companion services, while failing to disclose that the app would be rendered obsolete and substantially less valuable, useful and practical by Defendant's own business decisions, at a later time, and that considerable subscription fees would be required to continue using the applications.

(Doc. 60 at 23)  Plaintiff's claims in this regard seem to be twofold: 1.) Defendant led consumers to

believe that Ignition[15] was being discontinued and users had to pay for an annual subscription to LogMeIn Pro if they wanted to receive the services provided by the app; and, 2.) Defendant led users to believe LogMeIn Free and Ignition were "companion services" and, as such, failed to notify users that Ignition would be rendered less valuable due Defendant discontinuing LogMeIn Free in the future.

### i. Defendant told Ignition users the product would be "gradually" phased out

Plaintiff alleges that on January 21, 2014, Defendant informed Ignition users they would be "gradually migrate[d]" to a single, premium access product." (Doc. 60 at 5.) Plaintiff claims that by making this statement Defendant induced people to "purchas[e] paid subscription services rather than continuing to use the already purchased Ignition app services." (Doc. 64 at 13)

Why Plaintiff believes the statement is false or misleading is not clear. Indeed, there is no allegation in the complaint that at the time Defendant posted this message that it was false or misleading or that Defendant knew or should have known that it was. There is no showing that Defendant did not intend—or that it still does not intend—to discontinue Ignition at some point. The fact that Ignition users have not been forced away from the app—and the app continues to work—may be due to the subsequent concerns expressed by users as Plaintiff's counsel speculated at the hearing.

Moreover, Plaintiff ignores the evidence that on January 21, 2014, Defendant explicitly told Ignition users that it would provide further details as to how they would be impacted by this change. (Doc. 60 at 6)  Indeed, on January 31, 2014, Defendants offered Ignition users a six-month free subscription to LogMeIn Pro. (Doc. 17-3)  Defendant explained that they could continue to use Ignition regardless of whether they chose to accept the six-month subscription. Id. Defendant also explained that regardless of whether they accepted the complementary six-month subscription or regardless of whether they purchased a subscription after the end of the six-month free trial, they could continue to use Ignition for as long as Defendant maintained the app. Id. Defendant reminded Ignition users of these options again on February 14, 2014. Id.

It is unclear why Plaintiff feels he can proceed on this claim based upon this statement. The statement did not trick him and he did not buy a subscription as a result. Rather, except for a few

---

[15] He alleges also that Defendant misled users into believing that it was discontinuing LogMeIn Free and that to continue to obtain the utility of this product, users had to pay an annual subscription. However, there is no support for the claim that this statement was misleading. Rather, that is exactly what occurred.

weeks in January 2014 when he did not log into his Ignition app, he has continued to use the service uninterrupted throughout 2014 and 2015. (Doc. 63-1 at 21-35) While he may be outraged by what he feels occurred to others, the Court is not clear why he believes that this outrage makes him aggrieved such that he can vindicate this grievance in this litigation. Likewise, it is unclear why Plaintiff believes his claims are typical of the class such that he would be an adequate representative.[16] Thus, based upon the factual allegations plead and his clarifications made in his opposition to the motion, it is apparent Plaintiff has failed to state a claim in this regard.

### a. The institution of the subscription plan does not demonstrate does not constitute false advertising or a violation of the Unfair Competition Law

As noted above, there is no evidence Defendant knew at the time it sold the Ignition app to Plaintiff that it would discontinue support for the app or that it would "migrate" its users to a subscription-only plan in the future. Additionally, there was no obligation to tell prospective purchasers of the Ignition app anything about the intended "life" of LogMeInFree but, even if there was, Defendant posted this information on its website.

On the other hand, though Plaintiff alleges that in and around January 2014 Defendant posted one or more notices on its website indicating an intention to migrate users of the free and paid products to a subscription service, the complaint is ambiguous as to whether he saw or relied upon these January 2014 notices or that he relied upon them. (Doc. 60 at 7) At the hearing, his attorney specifically denied that Plaintiff recalled what messages he saw or when, despite Plaintiff's statements in his declaration. (Doc. 68-2 at 6) Moreover, the complaint refers to a message that Defendant was "discontinuing all technical and financial support," but in earlier complaints, he made clear that this did not occur until July 2014. (Doc. 46 at 10; Doc. 19 at 7) Thus, he has failed to demonstrate that the January 2014 message caused him any damage. To the contrary, despite whatever notice he *did* see, if any, Plaintiff continued to use the Ignition app through 2015. (Doc. 63-1 at 21-35)

///

---

[16] On a related note, the Court observes that the class allegations in the third amended complaint are inadequate. For example, Plaintiff offers no facts to support the Rule 23 elements and the common questions of fact he alleges are not questions of fact but are questions of law. However, because Defendant has not challenged these allegations, the Court's observations have no bearing on its ruling.

### ii.     The products were not inextricably intertwined

The fact that Plaintiff continues to state that LogMeIn Free and Ignition were "companion products" doesn't make them so.  Perhaps the example alleged in the complaint regarding the LogMeIn app and LogMeIn Pro, can best demonstrate this.  In the complaint, as noted in footnote 7, Plaintiff asserts that the new app is intertwined with LogMeIn Pro and explains that, while the app can be downloaded, *it is inoperable unless* the user also purchases a subscription. (Doc. 60 at 16-17)  This is a prime example of two products that are intertwined.  Here, however, the fact that Plaintiff used LogMeIn Free for more than a year before buying Ignition and then used Ignition for more than a year after LogMeIn Free was discontinued, demonstrates these two products are not dependent upon one another and they are not intertwined.  The fact that Plaintiff wanted to use both services and did so does not establish that Defendant's actions as to one product constituted an action as to the other.  The fact that some other users wanted to use--and did use—both products and assumed that they were meant to do so, proves nothing.  In Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1162 (9th Cir. 2012), the Court held,

> Of course, it is possible that some consumers might hazard such an assumption. But "[a] representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." Lavie, 129 Cal.Rptr.2d at 494 (internal citation and quotation marks omitted).

In addition, Plaintiff fails to address the evidence that Defendant *did* inform users through a publication on its website—without regard for whether Plaintiff actually looked at it—that it could terminate LogMeIn Free.[17]  (Doc. 48-1 at 2, 10-11)  Likewise, Defendant informed users that it could terminate Ignition. Thus, the fact that Defendant publically displayed information that told users that LogMeInFree and Ignition could be terminated undermines Plaintiff's claims.

Moreover, Plaintiff's attorney clarified at the hearing that Plaintiff does not dispute that the terms and conditions were available to him at the times of his download and purchase or that he didn't

---

[17] Ironically, one of the "complaints" noted by Plaintiff is his supplement filing acknowledges the "T&Cs" permit Defendant to terminate LogMeIn Free. (Doc. 68-1 at 20) Another notes, "I have used your free service (as most do) but always realized it wouldn't last." (Id. at 31) Another notes, "By all means terminate your free service, **you are entirely within your rights to do so**, but without any kind of notice!" Id. at 56, emphasis added.  Thus, even Plaintiff's evidence admits an understanding of the content of the terms and conditions or, at a minimum, the temporary nature of the free product.

agree to these terms.  Rather, he disputes only that he read the terms and conditions.  The failure of a consumer to read the terms and conditions before accepting them, is insufficient to avoid the contract.  Recently in <u>Nguyen v. Barnes & Noble Inc.</u>, 763 F.3d 1171, 1179 (9th Cir. 2014), the Court held, "While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, <u>Gillman v. Chase Manhattan Bank, N.A.</u>, 73 N.Y.2d 1, 11, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988), the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound."  However, where users must affirmatively agree to the terms as a condition of using of the product, courts routinely enforce the agreement. <u>Id</u>. at 1176-1177.

Even still, Plaintiff argues that the terms should not be enforced because he was not reminded when he purchased Ignition that LogMeIn Free could be terminated.  (Doc. 68-2 at 5)  However, the Court has found and continues to find that these products are not intertwined.  The products serve different needs. Once again, Plaintiff's action in using LogMeIn Free for more than a year before he purchased Ignition and then used Ignition for a year after Defendant discontinued LogMeIn Free, demonstrates this.  Thus, in short, the evidence shows Plaintiff cannot demonstrate that the statements related to "gradually" phasing out Ignition were false or misleading or that he was not informed that LogMeIn Free could be discontinued. Thus, Defendants are entitled to judgment.

## **ORDER**

Based upon the foregoing, the Court **ORDERS**:

1. Defendant's converted motion to dismiss (Doc. 63) is **GRANTED** and the Court **GRANTS** summary judgment in Defendant's favor;

2. The Clerk of the Court is DIRECTED to close this matter.

IT IS SO ORDERED.

Dated: **January 27, 2016**          /s/ Jennifer L. Thurston
                                      UNITED STATES MAGISTRATE JUDGE